IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Myra Lyles, : 
                Petitioner : 
                 : 
           v. : No. 792 C.D. 2024
                 : Submitted: May 6, 2025
Unemployment Compensation Board : 
of Review, : 
           Respondent : 


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
PRESIDENT JUDGE COHN JUBELIRER       FILED: August 21, 2025

Myra Lyles (Claimant) petitions for review of the May 24, 2024 Order of the Unemployment Compensation Board of Review (Board), which affirmed in part and reversed in part the decision of a Referee finding Claimant eligible for unemployment compensation (UC) benefits. The Board determined that Claimant was ineligible for UC benefits under Section 402(b) of the Unemployment Compensation Law (Law)[1] for compensable week ending April 30, 2022, because she voluntarily quit her employment without necessitous and compelling cause. Because the Board correctly determined that Claimant did not have a necessary and compelling reason to voluntarily quit, did not capriciously disregard competent evidence, and did not abuse its discretion in denying Claimant's request for reconsideration, we affirm.

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(b). Section 402(b) of the Law provides that "[a]n employe shall be ineligible for compensation for any week . . . [i]n which [her] unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature[] . . . ." 43 P.S. § 802(b).

# I. BACKGROUND

Claimant worked for Valley Medical Facilities, Inc. (Employer) from August 27, 2001, through April 22, 2022. (Bd.'s Findings of Fact (FOF) ¶ 1.) On March 14, 2022, Claimant began a new position as a residency coordinator and administrative specialist for the Heritage Valley Family Medicine Residency Program (Heritage Valley). (*Id.*; Certified Record (C.R.) at 87.)[2] However, in her new position, Claimant had difficulties performing computer work. (Bd.'s FOF ¶ 2; C.R. at 96-97.)

On April 20, 2022, Claimant had a discussion with her supervisor, Stephen Hagberg, M.D., who had previously expressed dissatisfaction with Claimant's computer skills. (Bd.'s FOF ¶ 3; C.R. at 86.) During that conversation, Claimant asked Dr. Hagberg for a layoff, and he informed Claimant that Employer could not lay her off, but that he would look into other options. (Bd.'s FOF ¶ 3; C.R. at 86-87, 92.) On April 22, 2022, Claimant had another discussion with Dr. Hagberg, wherein he informed Claimant that she could resign, look for another position within Heritage Valley, or begin a corrective action plan. (Bd.'s FOF ¶ 4.)

Effective May 2, 2022, Claimant went on an Employer-approved personal leave of absence for 12 weeks while she looked for another job. (*Id.* ¶ 5; C.R. at 119.)[3] The approval letter stated in relevant part:

> Your Personal Leave of Absence is effective beginning May 2, 2022 for a period of up to 12 weeks ending no later than July 23, 2022. If you have not secured a position within Heritage Valley by July 23, 2022, your employment will be terminated.

---

[2] Claimant previously worked for Employer as a mental health coordinator at the Staunton Clinic, where she "completed intake assessments for patients requesting outpatient therapy and management." (C.R. at 86, 91, 127.)

[3] The Board found, erroneously, that Claimant's leave of absence was "[e]ffective April 25, 2022." (Bd.'s FOF ¶ 5.) However, the evidence of record establishes that Claimant's leave of absence was actually "[e]ffective beginning May 2, 2022." (C.R. at 119; *see id.* at 118.)

While on a Personal Leave of Absence, you will use all of your accrued Paid Time Off. Once exhausted, you will receive a Benefit Statement informing you of any benefit premiums due.

(C.R. at 119.)

While Claimant was on leave from her position with Employer, she began a position with Allegheny Health Network on June 21, 2022. (Bd.'s FOF ¶ 6; C.R. at 101-02.) At the end of June 2022, Claimant informed Employer that she would not pay for continued medical benefits, knowing that Employer would soon be canceling her benefits. (Bd.'s FOF ¶ 7.) Claimant also informed Employer that she had secured employment with another employer and that her new benefits would begin on July 1, 2022. (*Id.*; C.R. at 106.) Claimant was terminated from her position with Allegheny Health Network on July 18, 2022. (Bd.'s FOF ¶ 6; C.R. at 12, 101.) Claimant did not return to work for Employer by July 23, 2022. (Bd.'s FOF ¶ 8.)[4]

On May 13, 2022, Claimant filed an application for UC benefits. (C.R. at 4, 11.) On June 21, 2022, the Department of Labor and Industry (Department) issued a Disqualifying Separation Determination, which stated: "We have determined that you left your employment to avoid being discharged. You believed you were going to be discharged. However, [E]mployer had not stated that you were going to be discharged, and work was still available to you when you left." (C.R. at 22.) Thus, the Department determined that Claimant was disqualified from receiving UC benefits under Section 402(b) of the Law. (*Id.*)

---

[4] On July 26, 2022, Employer sent Claimant a letter stating in relevant part:

Your Personal Leave of Absence was approved beginning May 2, 2022 for a period of 12 weeks not to exceed July 23, 2022.

Since you have not secured a position and returned to work by July 23, 2022, your employment with Heritage Valley . . . is being terminated as of July 23, 2022.

(C.R. at 120.)

3

Claimant appealed to the Referee, who held an evidentiary hearing on October 18, 2022. Claimant testified on her own behalf. Employer presented the testimony of Laurie Clemens, its Chief of Human Resources, and Ellen Heinlein, a Human Resources Specialist.

Regarding her initial meeting with Dr. Hagberg on April 20, 2022, Claimant testified:

> I wanted to speak to [Dr. Hagberg] because . . . I felt I was being undermined, and sidelined, marginalized. He wasn't returning my emails, and he made snide remarks about my computer proficiency. So I went to him and asked him for a layoff, if I could be laid off, being that he wasn't satisfied with my performance as far as the computer. He said everything else was great, that my soft skills were excellent, but as far as the computer [I] didn't meet his expectations. And so I went to speak to him, and he stated he would talk to Tracy Royal[, Employer's Regional Director of Operations,] about what could happen next and then he would get back to me within a couple of days.

(C.R. at 86.) According to Claimant, "[i]t sounded like [Dr. Hagberg] wanted [her] to be gone by the end of the week. However, he made it seem like they would explore other possibilities, even to find out if [she] could go back to Staunton Clinic." (*Id.* at 87.) When asked if she was told why she could not be laid off, Claimant replied:

> I was told by [Dr. Hagberg] that the work was still available, the job was still available, although it was obvious to me that they didn't want me in it, but that the job itself was still available. And he stated they didn't have anything to do with unemployment at all, they don't make that decision, but they could not lay me off.

(*Id.* at 92.) Claimant admitted that she asked to be laid off so she could collect unemployment benefits, stating "that was part of [their] conversation." (*Id.* at 98.)

Claimant testified that she met with Dr. Hagberg again on April 22, 2022, and "he said he did speak to Tracy [Royal], and the only option [Claimant] had was to

4

either resign or resign and look for other positions within Heritage Valley. . . [T]hose were [her] options." (*Id.* at 87.) At the end of that meeting,

> [Dr. Hagberg] told me not to come back because I told him I'm coming back to work on Monday. He said, No, I want to be pleasant, Myra. I wouldn't do that. You're a nice person. He raised his voice. So he made it very clear that I was not to return on Monday[, April] 25th.

(*Id.* at 87-88.) Claimant later clarified that during her April 22, 2022 meeting with Dr. Hagberg,

> he told me not to come back, . . . not to return that Monday. And if I did, then it wouldn't be pleasant, and I would be treated like one of the residents, and then it would be corrective. . . . He said that it would be a corrective plan.

(*Id.* at 99.)

Claimant took paid time off the week of April 25, 2022, in order to think about her options. (*Id.* at 88-89.) Claimant then submitted the paperwork to begin her personal leave of absence on May 2, 2022. (*Id.* at 89-90; *see id.* at 118.) She testified that she wanted to continue working but "felt that [she] was being coerced into quitting." (*Id.* at 91.)

Claimant testified that while she was on leave, "[a]t least a few times a week [she] checked on [Employer's] website just to see if there was anything close to [her] skills and qualifications," but "[t]here wasn't anything that met [her] skill level or qualifications," and she did not see any administrative positions posted. (*Id.* at 92, 94.) Claimant acknowledged that there were several positions available within Heritage Valley, but she did not apply for any of them "because most of them were way below [her] or way above [her] in terms of [her] skill level and qualification[s]." (*Id.* at 101.) Instead, she "look[ed] for other jobs at other places other than Heritage Valley." (*Id.*)

On cross-examination, Claimant acknowledged that the job posting for the residency coordinator position stated that the position required proficiency in Microsoft Office applications. (*Id.* at 95.) Claimant testified that after beginning her role as residency coordinator, she had difficulties with several Microsoft Office applications, including using the "save as" function in Word, typing up minutes from a meeting in Word, and searching for emails in Outlook. (*Id.* at 97-98.) She also testified that "Excel was [her] weakness" and agreed that the doctors had to show her how to perform basic functions in Excel. (*Id.* at 94-96.) Regarding her second meeting with Dr. Hagberg on April 22, 2022, Claimant testified that he did not explicitly direct her not to return to work, admitting that "[t]hose weren't his exact words." (*Id.* at 99.) Rather, she testified that Dr. Hagberg stated: "It won't be pleasant for you. I recommend you not [return]. You're a good person. We like you." (*Id.*)

Ms. Clemens testified that Employer has a "progressive corrective action" plan, which is "comprise[d] of [a] performance improvement plan and[] a verbal warning, a written warning. Sometimes it's a final written warning, a suspension, and then termination." (*Id.* at 104.) Ms. Clemens testified that in her role as Chief of Human Resources, she "approve[s] and review[s] any performance improvement plans" for an employee. (*Id.*) To initiate a corrective action plan, a supervisor "would . . . contact human resources, then we assist them in the development of the plan and understanding what the issues are. Because there's different elements that we can go down in terms of performance improvement, which would include training." (*Id.*) Ms. Clemens testified that a corrective action plan was never initiated for Claimant. (*Id.*)

Ms. Clemens further testified that, at that time, the positions Employer had available for which Claimant could have applied with her experience, education, and

6

work history included "[u]nit clerk, monitor tech, front office clerk, patient registrar, customer support rep, communications attendant, physician office assistant 1, 2, and 3, [and] billing specialist." (*Id.* at 107; *see id.* at 137-38.) Ms. Clemens testified that she "sign[s] off on all [] descriptions" for job postings and opined that Claimant "would [have met] the qualifications" for those positions. (*Id.* at 107.)

Ms. Heinlein testified that she approved Claimant's personal leave of absence and verbally informed Claimant that during her leave of absence, "she could bid on any vacant positions." (*Id.* at 105; *see id.* at 119.) Ms. Heinlein testified that, to her knowledge, Claimant did not bid on any open positions during her leave. (*Id.* at 105.) When asked how she would know if Claimant had bid on a position, Ms. Heinlein explained:

> [T]he recruiter would [] come to me and say, [Claimant's] on a leave of absence. Is she eligible to bid? Because some people on a leave of absence are not eligible to bid on positions. And in this case, because it was a personal leave, they always consult me before they pass that name on. So I would know that [Claimant] had not bid on anything.

(*Id.* at 106.)

On October 21, 2022, the Referee reversed the Department's Determination. In his decision, the Referee explained that to establish eligibility under Section 402(b) of the Law,

> [C]laimant must, at a minimum, establish that [E]mployer was notified of the conditions that existed and had an impact on the ability to remain employed. Such notice to [E]mployer exhibits an effort on the part of [C]laimant to maintain the employment relationship, and also affords [E]mployer an opportunity to respond to any conditions that may exist and provide any necessary accommodations.
>
> [C]laimant was told on her last day of work that she should resign or look for another job. [C]laimant took a leave of absence to satisfy this requirement, and she ultimately did find another job at another facility.

7

(C.R. at 142.) Therefore, the Referee concluded that Claimant was "eligible for [UC] benefits under [S]ection 402[(b)] of the [L]aw," effective April 22, 2022. (*Id.* at 144.)[5]

Employer appealed to the Board, which initially reversed the Referee's decision on September 12, 2023. (*Id.* at 168-69.) On September 15, 2023, Claimant filed a request for reconsideration with the Board, asserting that she had previously requested a copy of the hearing transcript and an opportunity to file a brief in response to Employer's appeal; however, "[i]nstead, the Board issued its decision, reversing the determination of the Referee, without providing [] Claimant any opportunity to file a brief or advocate [her] position." (*Id.* at 209-10, 220; *see id.* at 165.) On September 25, 2023, the Board granted reconsideration, vacated its prior Order, "reopened [the matter] to provide [C]laimant with copies of the transcript and exhibits," and permitted Claimant to file a supplemental brief. (*Id.* at 216.) Claimant filed her supplemental brief on October 10, 2023. (*See id.* at 240-53.)

On May 24, 2024, the Board entered an Order affirming in part and reversing in part the Referee's decision. The Board concluded:

> [C]laimant was having issues with performance. In discussing her work, **[C]laimant asked if [E]mployer could lay her off. [E]mployer refused, stating [C]laimant could instead resign, look for another position, or begin a corrective action plan.**
>
> **At the hearing, [C]laimant admitted that she was told she would be put on a corrective plan if she continued to work. The Board rejects [C]laimant's testimony that her supervisor told her not to return to work and that if she did, it would not be pleasant.** [C]laimant testified that the supervisor told her that everything else was great and that her "soft skills" were excellent. Furthermore, [E]mployer's witness testified that [E]mployer has in place a formal progressive action process where plans are approved through human

---

[5] Claimant filed claims for UC benefits for compensable weeks ending May 7, 2022, though April 22, 2023. (*See* C.R. at 140, 255.)

resources. Thus, **continuing work was available with a corrective action plan.** Such was not an imminent discharge situation. Resentment of supervisory criticism will not generally justify a quit.

In her brief to the Board, [C]laimant argues "there was no realistic or bona fide corrective action plan option" and that it was instead "illusory. . . ." However, at the hearing, [C]laimant admitted that if she returned to work, "[she] would be treated like one of the residents, and then it would be corrective." **According to [C]laimant, [E]mployer told her "it would be a corrective plan." Thus, [C]laimant could have been put on a plan and continued to work.**

(C.R. at 256-57 (emphasis added).)

The Board ultimately found that Claimant voluntarily quit her employment because she did not want to be placed on a corrective action plan. (Bd.'s FOF ¶ 9.) Therefore, the Board concluded that Claimant was ineligible for UC benefits under Section 402(b) of the Law for compensable week ending April 30, 2022.[6] (C.R. at 257.)

Claimant now petitions for review of the Board's decision.[7]

## II. ANALYSIS[8]

### A. Necessitous and Compelling Cause

First, Claimant asserts that the Board erred in concluding that she voluntarily quit without necessitous and compelling cause because she presented competent evidence that the actions of her supervisor, Dr. Hagberg, created substantial pressure

---

[6] The Board also concluded that Claimant was eligible for UC benefits for compensable week ending June 25, 2022, because "[C]laimant secured other employment at the end of June [2022]." (C.R. at 257.) Claimant does not challenge that portion of the Board's decision on appeal.

[7] Claimant filed a request for reconsideration of the Board's May 24, 2024 decision, which the Board denied on June 24, 2024.

[8] Our review of the Board's decision is limited to determining whether the necessary findings of fact are supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704.

9

for her to resign and Employer gave her no viable option to maintain her employment.[9]

Our Court has articulated the standard to be applied in voluntary quit cases as follows:

> Section 402(b) of the Law provides that a claimant shall be ineligible for [UC] benefits for a period "[i]n which his unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature . . . ." However, a determination that a claimant voluntarily quit is not an absolute bar to the recovery of [UC] benefits. A claimant may prove necessary and compelling reasons that could excuse the voluntary action of the claimant. . . .
>
> . . . An employee who claims to have left employment for a necessitous and compelling reason must prove that: (1) circumstances existed which produced real and substantial pressure to terminate employment; (2) such circumstances would compel a reasonable person to act in the same manner; (3) the claimant acted with ordinary common sense; and[] (4) the claimant made a reasonable effort to preserve [her] employment.

*Brunswick Hotel & Conf. Ctr., LLC v. Unemployment Comp Bd. of Rev.*, 906 A.2d 657, 660 (Pa. Cmwlth. 2006) (internal citations omitted).

---

[9] Before the Referee, Claimant's counsel had argued that Claimant's separation from employment should be considered a discharge under Section 402(e) of the Law, 43 P.S. § 802(e), because "[E]mployer . . . initiated the separation" and Claimant's resignation was "not voluntary under the circumstances." (C.R. at 108; *see id.* at 96.) Generally, "[w]hether a claimant's separation from employment is the result of a voluntary action or a discharge is a question of law subject to review by this Court." *Watkins v. Unemployment Comp Bd. of Rev.*, 65 A.3d 999, 1004 (Pa. Cmwlth. 2013). However, both the Referee and the Board analyzed this case solely as a voluntary quit under Section 402(b) of the Law, not as a discharge under Section 402(e). (*See* C.R. at 141 (the Referee considered Claimant's separation under Section 402(b) of the Law because "Section 402[(b)] was ruled on by the [Department] and the testimony taken [at the hearing] established that case"); *id.* at 256 (the Board stated that "[s]ince [C]laimant voluntarily left her employment, the burden rests upon her to show cause of a necessitous and compelling nature for so doing" under Section 402(b)).) In her Petition for Review and appellate brief, Claimant does not challenge the Board's failure to consider this case under Section 402(e). Consequently, to the extent Claimant argues in her brief that her separation was involuntary, (*see, e.g.*, Claimant's Br. at 4), we conclude that she has waived that argument.

Here, Claimant asserts that Dr. Hagberg's words and actions created real and substantial pressure for her to resign. Specifically, Claimant contends that Dr. Hagberg was "antagonistic towards her" due to his dissatisfaction with her computer skills and threatened that she would "suffer severe consequences" if she returned to work after April 22, 2022. (Claimant's Br. at 7, 12.) The Board, however, specifically discredited "[C]laimant's testimony that her supervisor told her not to return to work and that if she did, it would not be pleasant." (C.R. at 256-57.) It is well established that "'[q]uestions of credibility and the resolution of evidentiary conflicts are **within the sound discretion of the Board, and are not subject to re-evaluation on judicial review**.'" *Peak v. Unemployment Comp. Bd. of Rev.*, 501 A.2d 1383, 1388 (Pa. 1985) (emphasis added) (citation omitted). Further, "[i]t is irrelevant whether the record contains evidence to support findings other than those made by the fact[]finder; the critical inquiry is **whether there is evidence to support the findings actually made.**" *Ductmate Indus., Inc. v. Unemployment Comp. Bd. of Rev.*, 949 A.2d 338, 342 (Pa. Cmwlth. 2008) (emphasis added).

The Board explained that it discredited Claimant's testimony because the evidence established that Dr. Hagberg could not terminate Claimant's employment without first initiating a corrective action plan; no corrective action plan had been initiated for Claimant; and Dr. Hagberg praised other aspects of Claimant's work performance, including her "soft skills." (C.R. at 256-57; *see id.* at 86, 104, 117.) In addition, the emails exchanged between Claimant and Dr. Hagberg from April 24, 2022, through May 2, 2022, which Claimant entered into evidence, do not reflect any antagonistic or threatening behavior toward Claimant. For example, when Claimant asked if Dr. Hagberg would provide a reference for her while she searched for other positions within Heritage Valley, Dr. Hagberg replied:

11

I would be happy to serve as a reference for you as I truly feel you are a wonderful person and have many strengths but that it was just not a good fit for you in the position of residency coordinator. I wish you the best of luck as you look for another position!

(*Id.* at 116-17; *see also id.* at 115 (when Claimant expressed interest in taking a leave of absence, Dr. Hagberg stated: "The personal leave of absence is definitely still an option for you. I would absolutely approve the personal leave of absence if you want to go that route.").)

Moreover, Claimant presented conflicting testimony regarding Dr. Hagberg's statements during their April 22, 2022 meeting. Claimant initially testified that Dr. Hagberg did not offer her a corrective plan option, but on cross-examination, "[C]laimant admitted that she was told she would be put on a corrective plan if she continued to work." (C.R. at 256; *see id.* at 99.) On direct examination, Claimant testified that Dr. Hagberg explicitly told her not to return to work on Monday, April 25, 2022. On cross-examination, however, she clarified that Dr. Hagberg never explicitly stated that she could not return to work. (*See id.* at 99 ("Those weren't his exact words.").)

The Board found, based on the credited evidence of record, that Claimant was having issues with her work performance, her supervisor had expressed dissatisfaction with her computer skills, and Claimant approached her supervisor to ask if she could be laid off. (Bd.'s FOF ¶¶ 2, 3.) Employer then offered Claimant three options: take a personal leave of absence to look for another position within Heritage Valley, begin a corrective action plan, or resign. (*Id.* ¶ 4; C.R. at 256.) The Board determined that "Claimant voluntarily left employment . . . because she did not want to be placed on a corrective action plan," noting that "[p]ersonality conflicts with supervisors . . . or resentment of supervisory criticism, absent an intolerable work atmosphere, will not generally justify a quit" under Section 402(b) of the Law. (Bd.'s FOF ¶ 9; C.R. at 256); *see Uniontown Newspapers, Inc. v. Unemployment*

12

*Comp. Bd. of Rev.*, 558 A.2d 627, 629 (Pa. Cmwlth. 1989) ("Mere dissatisfaction with working conditions or resentment of supervisory criticism or a mere personality conflict[,] absent an intolerable work atmosphere, . . . does not constitute [a] necessitous and compelling reason[] for a voluntary quit."); *Lauffer v. Unemployment Comp. Bd. of Rev.*, 434 A.2d 249, 251 (Pa. Cmwlth. 1981) (recognizing that comments directly related to an employee's work performance are legitimate concerns of any supervisor and do not amount to necessitous and compelling cause). We conclude that the Board's findings are supported by the evidence of record.

Furthermore, Claimant did not make a reasonable effort to preserve her employment. **Claimant initiated the separation** by approaching her supervisor to ask for a layoff. When Claimant asked to be laid off, Employer allowed her to take a 12-week personal leave of absence[10] to search for another position within Heritage Valley. (C.R. at 119.) Employer's witnesses testified that there were several available positions within Heritage Valley during that time for which Claimant was qualified; however, Claimant did not apply for any of those positions. (*Id.* at 101, 105-07.) Instead, Claimant looked for jobs outside the company and ultimately accepted a job with another employer. (*Id.* at 101, 106; Bd.'s FOF ¶ 6.) Further, Claimant's residency coordinator position remained available, and the Board found, based on the evidence of record, that she could have continued in that role on a corrective action plan. (*See* C.R. at 257 ("[C]laimant could have been put on a

---

[10] Claimant testified, and the Board found, that Claimant's leave of absence was unpaid. (Bd.'s FOF ¶ 5; *see* C.R. at 92 (when asked if Employer was paying her while she was on leave, Claimant replied, "No, they were not.").) However, Employer's May 2, 2022 letter to Claimant approving her personal leave of absence stated, in relevant part, "While on a Personal Leave of Absence, **you will use all of your accrued Paid Time Off**." (C.R. at 119 (emphasis added).) Thus, it appears that Claimant would have been paid to the extent she had not exhausted her accrued paid time off.

[corrective] plan and continued to work.").) Claimant instead chose to resign, even though continuing work was available to her. Under these circumstances, the Board properly concluded that Claimant did not establish a necessary and compelling reason to voluntarily quit. *See Middletown Twp. v. Unemployment Comp. Bd. of Rev.*, 40 A.3d 217, 225 (Pa. Cmwlth. 2012) (recognizing that "'[c]laimants who, *while employed*, refuse to accept an offer of *continued* employment are deemed to have quit their position'" under Section 402(b) of the Law) (citation omitted) (italics in original).

### B. Capricious Disregard of Evidence

Next, Claimant asserts that the Board capriciously disregarded Claimant's "ample and unrebutted evidence that [Dr. Hagberg's actions] created substantial pressure for her not to return to the workplace." (Claimant's Br. at 20.)

"A capricious disregard of evidence occurs where the fact[]finder willfully and deliberately disregards competent and relevant evidence that one of ordinary intelligence could not possibly have avoided in reaching a result." *Wise v. Unemployment Comp. Bd. of Rev.*, 111 A.3d 1256, 1262 (Pa. Cmwlth. 2015). Our Supreme Court has explained that review for capricious disregard is an "appropriate component of appellate consideration in every case in which such question is properly before the court." *Leon E. Wintermyer, Inc. v. Workers' Comp. Appeal Bd. (Marlowe)*, 812 A.2d 478, 487 (Pa. 2002). "[W]here there is substantial evidence to support the agency's factual findings and those findings support the legal conclusions, 'it should remain a rare instance in which an appellate court would disturb an [agency] adjudication based upon capricious disregard.'" *Wise*, 111 A.3d at 1262 (citing *Leon E. Wintermyer*, 812 A.2d at 487 n.14). "Disturbing an agency's adjudication for a capricious disregard of evidence is appropriate **only** where the factfinder has refused to resolve conflicts in the evidence, has not made essential

14

credibility determinations[,] or has completely ignored overwhelming evidence without comment." *Id.* at 1263 (emphasis added). Finally, "[a]n appellate court conducting a review for capricious disregard of material, competent evidence may not reweigh the evidence or make credibility determinations." *Id.*

Claimant contends that "[t]he Board made no specific findings as to [Claimant's] credibility" and simply disregarded her "unchallenged" testimony regarding her conversations with Dr. Hagberg. (Claimant's Br. at 22.) The record belies this claim. In its decision, the Board explicitly "reject[ed] [C]laimant's testimony that her supervisor told her not to return to work and that if she did, it would not be pleasant." (C.R. at 256-57.) Claimant maintains that her uncontroverted testimony established that Dr. Hagberg made repeated threats that she would "suffer severe consequences" if she returned to work after April 22, 2022, which created substantial pressure for her to resign. (Claimant's Br. at 12, 21; *see id.* at 21 n.3 (Claimant characterizes Dr. Hagberg's statements as a "warning of ominous things to come if she returned to th[e] workplace"); *id.* at 21 (Claimant asserts that Dr. Hagberg's threats not to return to work were "more of a fist in a velvet glove as to consequences that would be suffered, not a euphemistic prediction that she might be overly sensitive to supervisory criticism").) As explained earlier, given the inconsistencies in Claimant's testimony and the weight of contradictory evidence in the record, the Board acted well within its discretion in rejecting Claimant's testimony. *See Daniels v. Unemployment Comp. Bd. of Rev.*, 755 A.2d 729, 731 (Pa. Cmwlth. 2000) ("The Board, as the ultimate factfinder, determines the weight and credibility of the evidence **and is free to reject even uncontradicted testimony**.") (emphasis added). Therefore, because the Board considered and explicitly addressed Claimant's evidence, (*see* C.R. at 256-57), we cannot conclude that it capriciously disregarded competent, relevant evidence in this case.

15

## C. Denial of Reconsideration

Lastly, Claimant asserts that the Board abused its discretion when it denied her request for reconsideration of its May 24, 2024 decision. We disagree.

The Board's regulations provide that reconsideration "will be granted only for good cause in the interest of justice without prejudice to any party." 34 Pa. Code § 101.111(b). "'In determining whether 'good cause' exists, the [Board] must consider whether the party requesting reconsideration has presented new evidence or changed circumstances or whether [the Board] failed to consider relevant law.'" *Laster v. Unemployment Comp. Bd. of Rev.*, 80 A.3d 831, 834 (Pa. Cmwlth. 2013) (citation omitted). Further, where a reconsideration request does not "allege a change of circumstance, seek to introduce new evidence that was unavailable at the time of the hearing, or articulate any legal theory that the [Board] failed to consider in its initial decision," but "merely reargue[s] [the petitioner's] case before the [Board]," the petitioner does not establish good cause. *Id.* We review the Board's decision to deny a request for reconsideration for an abuse of discretion. *Id.* at 834 n.5.

In her request for reconsideration, Claimant did not allege a change of circumstance, seek to present new evidence that was unavailable at the time of the Referee's hearing, or articulate any legal theory that the Board failed to consider in its decision. (*See* C.R. at 266-72.) Rather, Claimant challenged only the Board's resolution of evidentiary conflicts and determinations of witness credibility, which does not amount to good cause justifying the grant of reconsideration. *See Ensle v. Unemployment Comp. Bd. of Rev.*, 740 A.2d 775, 779-80 (Pa. Cmwlth. 1999) (recognizing that the Board may not grant reconsideration merely to revisit credibility issues); *Bushofsky v. Unemployment Comp. Bd. of Rev.*, 626 A.2d 687, 690 (Pa. Cmwlth. 1993) (stating that reconsideration is properly denied where the

16

claimant merely seeks to introduce "the evidence already offered"). Therefore, we conclude that the Board did not abuse its discretion in denying Claimant's request for reconsideration.

## III. CONCLUSION

In sum, we conclude that the Board correctly determined that Claimant voluntarily resigned from her position with Employer without a necessary and compelling reason; the Board did not capriciously disregard competent evidence; and the Board did not abuse its discretion in denying reconsideration. Accordingly, we affirm the Board's Order.

_____
RENÉE COHN JUBELIRER, President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Myra Lyles,
                Petitioner

           v.

Unemployment Compensation Board
of Review,
                Respondent

:
:
:
:   No. 792 C.D. 2024
:
:
:
:

## **O R D E R**

NOW, August 21, 2025, the May 24, 2024 Order of the Unemployment Compensation Board of Review is hereby **AFFIRMED**.

_____
RENÉE COHN JUBELIRER, President Judge